# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

HERBERT JOHNSON,

      Plaintiff,

v.
                          Case No. 6:18-cv-608-JA-LHP

EAST COAST WAFFLES,

      Defendant.

_____

## ORDER

This case is before the Court on Defendant's motion for summary judgment (Doc. 118), Plaintiff's response (Doc. 132), and Defendant's reply (Doc. 136). Having considered the parties' submissions, the Court finds that the motion must be denied.[1]

## I.    FACTS

Defendant does business as Waffle House, a diner-style restaurant chain serving Southern breakfast foods twenty-four hours a day, seven days a week. (Doc. 132-2 at 2, 14, 22, 34). In the early-morning hours of Martin Luther King Jr. Day, Monday, January 15, 2018, Plaintiff's twenty-three-year-old son, Herbert Johnson III, was shot and killed in the parking lot of one of Defendant's

---

[1] The parties request oral argument on the motion. (*See* Docs. 122 & 134). Because oral argument is unnecessary to resolve the motion, those requests will be denied.

Orlando, Florida restaurants. (Doc. 117-8 at 8; Doc. 118-5 at 3). Defendant has numbered cameras at the restaurant, and five of these cameras (Camera 1; Camera 2; Camera 3; Camera 6; Camera 7) captured portions of the incident on video.

The Waffle House location at issue maintained a brightly lit parking lot, (Camera 6; Camera 7), and had windows large, plentiful, and unobstructed enough that the individuals inside could easily see those outside, and vice versa, (Camera 1; Camera 2; Camera 3). On the weekends, in the hour or so after 2 a.m., the Waffle House typically experienced a "bar rush"—"an influx of customers" coming from nearby bars—because that location and a Steak 'n Shake were the only restaurants in the area that were open after the bars closed. (Doc. 132-1 at 22; Doc. 132-5 at 4–5). Generally, Waffle House management scheduled more employees to work when it expected to receive more customers, and it considered the bar rush in making its scheduling decisions. (Doc. 132-5 at 6). Typically during a bar rush, five to six employees would be working, and customers in "[v]arious states of intoxication" would act in a "rowdy" manner inside the restaurant and would have to be told to "calm down." (*Id.* at 6, 8; Doc. 132-1 at 23). It was common to see "arguments and people starting to either face off or have words." (Doc. 132-1 at 23).

On the morning of Herbert's death, only three employees were working— a cook and two servers—even though it was a holiday weekend and "multiple

people" in their twenties and thirties were "coming in at once" after the bars closed. (Doc. 132-5 at 7). Al-Jalil Byrd, the man who eventually shot Herbert, left an event at Gilt Nightclub and went to the Waffle House with his girlfriend, Jaelynn Castillo, and a group of their friends. (Doc. 132-1 at 16, 22–23). Byrd and his friends had been drinking Hennessey Cognac and smoking marijuana. (*Id.* at 23). At least one of the friends, Louventz Charles, drank alcohol before going to the nightclub, drank more at the club, and kept drinking while sitting in a car in the Waffle House parking lot. (Doc. 132-6 at 7). Inside the restaurant, Byrd and his friends spread out around the tables farthest from the entrance. (*See, e.g.*, Camera 1 at 2:58:00 a.m.).

Herbert went to the Waffle House with his friends Rickie Calderon and Calvin Savage. (Doc. 118 ¶¶ 12, 14; Doc. 132 at 2–3). They left the same club event that Byrd had attended and arrived at the Waffle House in Calderon's car at 2:36:55 a.m. (Doc. 118 ¶ 12; Doc. 132 at 2–3; Doc. 132-1 at 7; Camera 7). Calderon parked behind a white car in front of the Waffle House entrance. (Camera 7 at 2:36:55 a.m.). While Herbert, Calderon, and Savage were inside the Waffle House, that white car drove out of the parking lot, leaving open space in front of Calderon's car. (*Id.* at 2:44:23 a.m.).

At 2:38:01 a.m., Herbert walked up to the counter in the restaurant to place a to-go order. (Camera 3; Doc. 118-5 at 5; Doc. 118-6 at 15). During the fifteen- to twenty-minute wait for the food, Herbert first stood by the counter

3

talking to Calderon, then sat with Calderon and Savage in seats by the entrance, and finally visited the restroom. (Camera 2 at 2:38:01 a.m.–2:57:00 a.m.). It does not appear from the video that Herbert interacted with Byrd's group of friends in the rear of the restaurant or got into any conflict while inside the restaurant. (*See id.*; *see also* Doc. 118-5 at 9 (Calderon's deposition testimony that he did not "see anyone verbally threaten anyone else inside the Waffle House" for the twenty minutes that he was there)). At 2:57:00 a.m., Herbert collected the bag with his to-go order from the counter, and thirty seconds later, he exited the restaurant, followed by Calderon and Savage. (Camera 2).

Around this time, Byrd's group of friends became "really rowdy" inside the Waffle House. (Doc. 132-5 at 6). For example, at 2:58:20 a.m., two men bumped into each other, and a woman took a swing at one of them. (Camera 1 at 2:58:19 a.m.–2:58:29 a.m.). Because Byrd and his friends had been causing a disruption by "be[ing] abnormally loud and . . . interrupting . . . other customers," staff warned them to calm down. (Doc. 132-5 at 6–8). Usually, when warned, groups disrupting the Waffle House would comply, but Byrd's group "got worse," "more rambunctious." (*Id.* at 6, 8). To the cook on duty, it "seem[ed] like they might have been arguing." (*Id.* at 8). Thus, they were "told . . . to leave." (*Id.* at 6). When they did not leave, the cook "told one of the servers to call the cops" because he "figured [that] a fight would happen because they were arguing." (*Id.* at 6, 8). At that point, Byrd and his friends left, but they "just exited outside"

where they "huddled up" right in front of the Waffle House. (*Id.* at 6). Because, for all practical purposes, they were still at the restaurant, the cook again asked a server to "call the police." (*Id.* at 6, 8).

When Herbert, Calderon, and Savage exited the Waffle House, Savage and Herbert got in the car right away, but Calderon lingered by the driver's door for a solid minute before getting in. (Camera 7 at 2:57:53 a.m.–2:58:50 a.m.). At 2:58:50 a.m., the three friends and the food were in the car with the doors closed, and no cars or other obstacles blocked their way out of the parking lot. (*Id.*). Nonetheless, Calderon did not drive off, (*id.* at 2:58:50 a.m.–2:59:26 a.m.), because Herbert was checking that his to-go order had been correctly fulfilled, (Doc. 118-6 at 15).

Byrd exited the Waffle House at 2:58:37 a.m. (Doc. 118 ¶ 20; Doc. 132 at 2–3). He "started banging on" the restaurant's windows and then directed loud, "aggressive talk" toward Herbert, Calderon, and Savage. (Doc. 118-5 at 12; Doc. 118-6 at 16–17; Doc. 132 at 7 ¶ 6). The three friends got out of Calderon's car to calm Byrd down, and even though Herbert did not want to fight, they ended up getting into an altercation with Byrd. (Doc. 118 ¶ 22; Doc. 132 at 2–3; Doc. 132-6 at 8). Given the Byrd group's disruptive behavior, the Waffle House staff called 9-1-1 at 3:00:47 a.m. and requested an officer, reporting that "some kids" were "trying to fight." (Doc. 117-8 at 1; Doc. 118 ¶¶ 27–28; Doc. 132 at 2–3). Around 3:02:32 a.m., staff told the 9-1-1 operator that someone "ha[d] a gun out." (Doc.

118 ¶ 30; Doc. 132 at 2–3). About twenty seconds later, shooting started. (Doc. 118 ¶ 31; Doc. 132 at 2–3). Herbert was back in the passenger seat of Calderon's car when Byrd reached through the car's window and shot him. (Doc. 132-1 at 19; *see also* Doc. 132 at 9 ¶ 12). Byrd shot Herbert twice—once in the right lower back and once in the right hip. (Doc. 118-7 at 2). Calderon also had a gun, which he "fir[ed] in self-defense." (Doc. 118-5 at 15). The whole incident in the parking lot, from when Byrd exited the Waffle House to when the shooting occurred, lasted less than five minutes. (Doc. 118-2 at 12). The medical examiner determined that Byrd's gunshots caused Herbert's death. (Doc. 118-7 at 2).

In the three years before Herbert's death, the Waffle House location at issue saw five physical fights and thirteen verbal disputes between customers, as well as three events involving a disruptive customer. (Doc. 132-12 at 3; Doc. 136 at 2). One of those incidents occurred only four days before Herbert's death and involved five to six men "heated[ly]" exchanging words and "about to start a fight" inside the Waffle House. (Doc. 132-10 at 193 (emphasis omitted)). The 9-1-1 report for that incident mentioned a gun. (*Id.*). Plaintiff's security expert, John Villines, examined the history of criminal activity around the Waffle House for the four years before Herbert's death, (Doc. 118-2 at 5–6); considered the risk factors at play in Herbert's death—customers' alcohol consumption, the holiday weekend, and the fact that the confrontation occurred in a parking lot in Orlando; and opined that Defendant failed to provide adequate security in

various ways, (Doc. 118-1). For example, Villines concluded that Defendant inadequately assessed its security weaknesses, failed to make a site-specific security plan, did not properly train its employees to respond to drunk and disruptive customers, and failed to implement reasonable security measures for the parking lot. (*Id.* at 11–17). Villines also testified in his deposition that Defendant's main security failures were that it insufficiently anticipated the holiday bar rush and did not have "an armed, uniformed security officer or . . . extra duty law enforcement officer." (Doc. 118-2 at 11).

## II.  PROCEDURAL HISTORY

In April 2018, Plaintiff filed this wrongful death action, alleging that Defendant's negligence caused Herbert's death. (Doc. 1). The amended complaint asserts that Herbert was an invitee on Defendant's premises, that Defendant therefore owed him duties to maintain its premises in a reasonably safe condition and to warn him of the danger of harm from reasonably foreseeable criminal attacks by third parties, and that it breached these duties, resulting in his death. (*See* Doc. 7).

On the parties' joint motion, the Court stayed this case pending state criminal proceedings against Byrd and Castillo because the parties could not depose key witnesses until after those proceedings concluded. (Docs. 46 & 47). That stay lasted almost four years. (*See* Docs. 47 & 98). During that time, the parties reported that a jury convicted Byrd of second-degree murder for

Herbert's death and that Castillo was under an open plea agreement. (Doc. 95 ¶¶ 3, 7). After the stay was lifted, Defendant filed the instant motion for summary judgment. (Doc. 118).

## III.  SUMMARY JUDGMENT STANDARDS

Summary judgment shall be granted if the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Generally, in deciding a motion for summary judgment, the Court "view[s] the facts and draw[s] all reasonable inferences in favor of [the nonmoving party]." *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013).

The party moving for summary judgment bears the burden of demonstrating that no genuine issues of material fact remain. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the [C]ourt—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When presented with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). The Court's role at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

8

(1986). "In essence, . . . the inquiry . . . is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## IV.   DISCUSSION

Under Florida law, a negligence claim has four elements: (1) "[a] duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks"; (2) the defendant's breach of the duty, or "failure . . . to conform to the standard required"; (3) proximate causation, meaning "[a] reasonably close causal connection between the [defendant's] conduct and the resulting injury"; and (4) "[a]ctual loss or damage." *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (quoting *Prosser and Keaton on the Law of Torts* 164–65 (W. Page Keeton ed., 5th ed. 1984)). Whether a duty exists is a question of law. *Wallace v. Dean*, 3 So. 3d 1035, 1046 (Fla. 2009). In contrast, "[i]n the majority of negligence actions, each of [the three remaining] elements is properly a question for the trier of fact." *Id.* n.18.

In its summary judgment motion, Defendant focuses on the first and third elements, arguing that it did not owe a duty to protect Herbert from or warn him about Byrd's attack and that Plaintiff cannot establish proximate causation. (Doc. 118 at 15–24). The Court addresses these arguments in turn.

### A.   Foreseeability of the Attack

9

As Defendant recognizes, (*id.* at 16), a business has a duty to its invitees "to use due care to maintain its premises in a reasonably safe condition," which "includes the duty to protect customers from criminal attacks that are reasonably foreseeable." *Banosmoreno v. Walgreen Co.*, 299 F. App'x 912, 913 (11th Cir. 2008);[2] *see Stevens v. Jefferson*, 436 So. 2d 33, 34 (Fla. 1983); *Foster v. Po Folks, Inc.*, 674 So. 2d 843, 844 (Fla. 5th DCA 1996).[3] In its first of two arguments about duty, Defendant disputes the foreseeability of the attack that befell Herbert. (Doc. 118 at 15–21).

To establish that a criminal attack was foreseeable, a plaintiff may show that "the proprietor knew or should have known of the dangerous propensities of a particular patron" or "knew or should have known of a dangerous condition on [the] premises that was likely to cause harm to a patron." *Stevens*, 436 So. 2d at 34. "A dangerous condition may be indicated if, according to past experience . . . , there is a likelihood of disorderly conduct by third persons in general which might endanger the safety of patrons or if security staffing is inadequate. These indicia are not exhaustive." *Hall v. Billy Jack's, Inc.*, 458 So.

---

[2] In the Eleventh Circuit, "unpublished decisions . . . bind no one," *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016), but "may be cited as persuasive authority," 11th Cir. R. 36-2.

[3] "A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983).

2d 760, 762 (Fla. 1984); *see also Meyers v. Ramada Hotel Operating Co.*, 833 F.2d 1521, 1523 (11th Cir. 1987) ("Evidence relevant to foreseeability includes the general likelihood of harm to the invitee, criminal activity in the vicinity, and security measures taken by the owner of the premises.").

Usually, the "question of foreseeability is for the trier of fact." *Hall*, 458 So. 2d at 762 (citing *Gibson v. Avis Rent-A-Car Sys.*, 386 So. 2d 520 (Fla. 1980)); *accord Banosmoreno*, 299 F. App'x at 914 ("recogniz[ing] that several Florida cases have permitted a plaintiff to get to the jury on the issue of foreseeability"). However, summary judgment is proper if, "[c]onsidering all of the evidence, no reasonable jury could find th[e] attack foreseeable." *Banosmoreno*, 299 F. App'x at 914.

Defendant maintains that the attack that befell Herbert "was not reasonably foreseeable to Defendant given the lack of sufficient history of prior similar crimes." (Doc. 118 at 18–20). But, viewing the record in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find the attack foreseeable as resulting from a "dangerous condition . . . indicated" by Defendant's "past experience[s]" with "disorderly conduct by third persons in general." *Hall*, 458 So. 2d at 762. Defendant is incorrect to focus the foreseeability analysis so narrowly on the "history of prior similar crimes," (Doc. 118 at 20), because "[f]oreseeability is determined in light of all the circumstances of the case rather than by a rigid application of a mechanical

'prior similars' rule[]," *Bellevue v. Frenchy's S. Beach Café, Inc.*, 136 So. 3d 640, 643 (Fla. 2d DCA 2013) (first alteration in original) (quoting *Holiday Inns, Inc. v. Shelburne*, 576 So. 2d 322, 331 (Fla. 4th DCA), as "applying the holdings of" *Stevens*, 436 So. 2d 33; *Allen v. Babrab, Inc.*, 438 So. 2d 356 (Fla. 1983); and *Hall*, 458 So. 2d 760). The Court agrees with Plaintiff that the Waffle House location's regular use as "an after-party spot for groups of intoxicated people," the "prior criminal history," and the unruliness of Byrd's group of friends in the minutes before the attack support the foreseeability of the attack such that a reasonable jury could find the attack foreseeable. (Doc. 132 at 11).[4]

## B.    Herbert's Knowledge of the Danger

In addition to maintaining its premises in a reasonably safe condition, an owner must warn an invitee "of concealed perils which are or should be known to the [owner], and which are unknown to the invitee and cannot be discovered

---

[4] Defendant also asserts that no additional security measures would have prevented the attack. (Doc. 118 at 18, 20–21). Plaintiff responds that Defendant "conflates foreseeability as it relates to duty . . . and foreseeability as it relates to causation." (Doc. 132 at 11 n.1). The Court agrees with Plaintiff and, in any event, disagrees with Defendant's assertion. Defendant relies on *Banosmoreno*, but that case is distinguishable. *Banosmoreno* involved a "*personal dispute*" between two men over one of them's flirting with the other's girlfriend. 299 F. App'x at 914 (emphasis in original). The court held that "location can play a critical role in the foreseeability of an attack," emphasizing that the attack there "occurr[ed] inside the store in plain view of witnesses" rather than "in a rowdy bar or darkened parking lot." *Id.* Here, in the light most favorable to Plaintiff, Byrd's attack was not "personal" in the same sense. And although it occurred in front of witnesses in the brightly lit parking lot of a restaurant, it did occur in a parking lot at night and at a rowdy restaurant serving as an after-bar location. Thus, *Banosmoreno* does not support that Byrd's attack was inevitable regardless of additional security measures.

by him through the exercise of due care." *Miller v. Wallace*, 591 So. 2d 971, 973 (Fla. 5th DCA 1991). It follows that "an owner has no duty to warn where the danger is obvious and apparent, or the invitee otherwise has knowledge of the danger which is equal to or superior to the owner's knowledge." *Id.* In its second argument about duty, Defendant asserts both that the danger of crime is obvious and that Herbert had knowledge of the danger of Byrd's attack equal or superior to Defendant's own knowledge. (Doc. 118 at 21–22).[5]

Regarding the obviousness of the danger to Herbert, Defendant contends that it owed no duty to warn of crime. (*Id.* at 21).[6] Although property owners do not owe a duty to warn uninvited licensees of crime, *see Barrio v. City of Miami Beach*, 698 So. 2d 1241, 1244 (Fla. 3d DCA 1997) ("With regards to uninvited

_____

[5] Because Defendant makes the sweeping statement that it "cannot be liable as a matter of law" given Herbert's equal or superior knowledge of the danger, (Doc. 118 at 22), it is unclear whether Defendant's argument addresses only the duty to warn or also encompasses the duty to maintain. Insofar as Defendant contends that given Herbert's knowledge, Defendant did not have a duty to maintain its premises in a reasonably safe condition, i.e., a duty to protect him from a reasonably foreseeable criminal attack, Defendant is incorrect. *See Miller*, 591 So. 2d at 973 ("An owner is subject to liability for not taking additional precautions for the safety of the invitee when the danger is such that the owner should reasonably anticipate that it creates an unreasonable risk of harm to an invitee *notwithstanding* a warning or *the invitee's knowledge of the danger*." (emphasis added)). Moreover, such a position would contradict Defendant's acknowledgment in the foreseeability section of its motion that a business owes its invitees a duty to protect them from reasonably foreseeable criminal attacks. (*See* Doc. 118 at 16).

[6] Defendant's contradictory position that it owed Herbert a duty to protect him from a reasonably foreseeable criminal attack, Doc. 118 at 16, but did not owe him a duty to warn him about a criminal attack, *id.* at 21–22, seems rooted in Defendant's interpretation of the distinction in Florida premises-liability law between the duty to maintain and the duty to warn. *See Miller*, 591 So. 2d at 973.

licensees, . . . we have said that the danger of crime and criminal assaults is an open and obvious danger for which there is no duty to warn."), property owners have a special relationship with invitees that warrants different treatment, *see Gross v. Fam. Servs. Agency, Inc.*, 716 So. 2d 337, 337–39 (Fla. 4th DCA 1998) (listing "landowner-invitee" as "[a]mong the recognized 'special relationships' where defendants have been held liable for failure to exercise reasonable care when injuries have actually been inflicted by third parties"); *T.W. v. Regal Trace, Ltd.*, 908 So. 2d 499, 503 (Fla. 4th DCA 2005) (describing *Gross* as a case in which "a special relationship . . . was established" and "a duty to protect *and warn* against a foreseeable . . . assault . . . was found" (emphasis added)); *see also Lee v. Clorox Int'l Co.*, 466 F. App'x 826, 828–29 (11th Cir. 2012) (examining the duty to warn under Florida law and describing a "special relationship," like that between a business and its invitee, as an "exception to the general rule" that "no liability" exists "for third-party criminal acts"). Here, Herbert was a business invitee, not an uninvited licensee, (*see* Doc. 118 at 21), so Defendant had a duty not only to protect him but also to warn him against a foreseeable attack.

Regarding Herbert's knowledge of the danger, Defendant asserts that "[i]f anyone had knowledge of [Byrd]'s criminal propensity, it was [Herbert]." (*Id.* at 22). But, as Plaintiff points out, Defendant was better-positioned than Herbert to know generally "of the late-night rowdy intoxicated crowds" that frequented

the Waffle House on the weekends and "of the prior crimes on the premises." (Doc. 132 at 17). Moreover, in the light most favorable to Plaintiff, the record supports that Defendant knew more about the rowdiness of Byrd's group of friends prior to the attack than Herbert did. Thus, the issue whether Herbert or Defendant had superior knowledge of the danger of Byrd's attack cannot be resolved on summary judgment.

### C.   Proximate Causation

"The issue of proximate cause is generally a question of fact concerned with 'whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.'" *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1116 (Fla. 2005) (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)). "A negligent actor . . . is not liable for damages suffered by an injured party 'when some separate force or action is the active and efficient intervening cause' of the injury" because "[s]uch an intervening cause supersedes the prior wrong as the proximate cause of the injury by breaking the sequence between the prior wrong and the injury." *Id.* (quoting *Gibson*, 386 So. 2d at 522). "However, 'if an intervening cause is foreseeable[,] the original negligent actor may still be held liable.'" *Id.* (quoting same).

In its final argument, Defendant asserts that Plaintiff cannot establish proximate causation because Herbert's decision to exit Calderon's car to

confront Byrd amounted to "an intervention of an independent efficient cause." (Doc. 118 at 23–24). As support, Defendant relies exclusively on *Palma v. BP Products North America, Inc.*, 594 F. Supp. 2d 1306 (S.D. Fla. 2009).

The *Palma* court recited the lengthy, fact-intensive chain of events leading to the plaintiffs' injuries [7] and concluded that the chain "was so improbable and 'freakish' as to be unforeseeable." *Id.* at 1310–12. Courts have distinguished *Palma* where "the extensive chain of events that led to the eventual injury in [that case] . . . [wa]s lacking," *Wong Ho v. Hertz Corp.*, No. 09-20724-CIV-KING, 2010 U.S. Dist. LEXIS 74816, at *10 (S.D. Fla. July 26, 2010), and where the defendant had some "warning of the potential risk" that resulted in the plaintiff's injuries, *Cain v. Shell Oil Co.*, 994 F. Supp. 2d 1247, 1251 (N.D. Fla. 2014); *Thomas v. Circle K Stores*, No. 8:19-cv-2817-JSS, 2021 U.S. Dist. LEXIS 140237, at *15 (M.D. Fla. May 26, 2021).

Here, *Palma*'s extensive chain of events is lacking; the facts are not comparable. And the Court cannot conclude as a matter of law that Defendant

---

[7] In *Palma*, the plaintiffs paid for gas at the defendant's gas station. *Id.* at 1307, 1310. Third parties siphoned gas from a different pump. *Id.* The defendant cut off that pump to stop the siphoning. *Id.* at 1307. The third parties moved their car to a new pump and, in the process, took up a position facing the plaintiffs' car. *Id.* at 1307–08. The plaintiffs pumped gas. *Id.* at 1308, 1310. The third parties demanded that the plaintiffs let them use the pump, but the plaintiffs declined to do so. *Id.* The third parties moved their car to another pump and, in the process, hit the plaintiffs' car. *Id.* The plaintiffs confronted the third parties about the collision. *Id.* The third parties had words with the plaintiffs and refused to accept responsibility for any damage to the plaintiffs' car. *Id.* The plaintiffs started calling 9-1-1. *Id.* And the third parties repeatedly punched and kicked one of the plaintiffs before running away. *Id.* at 1308.

lacked knowledge of the risk to Herbert or that the chain of events between Defendant's alleged security failures and Herbert's death was "so improbable and 'freakish' as to be unforeseeable." *Palma*, 594 F. Supp. 2d at 1312. Furthermore, as *Palma* itself acknowledges, "proximate cause may still exist where an independent intervening cause is itself probable or foreseeable." *Id.* at 1311 n.3; *accord Gibson*, 386 So. 2d at 522 ("[W]hen . . . conduct 'sets in motion' a chain of events resulting in injury to the plaintiff[,] . . . [i]f an intervening cause is foreseeable[,] the original negligent actor may still be held liable. The question . . . whether an intervening cause is foreseeable is for the trier of fact."). Here, even if Herbert's decision to exit Calderon's car to confront Byrd were an intervening cause, a reasonable jury could find that it was foreseeable.

## V.   CONCLUSION

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (Doc. 118) and the parties' requests for oral argument on the motion (Docs. 122 & 134) are **DENIED**.

**DONE** and **ORDERED** on January 4, 2024.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record